Appellant, Ms. Royce for the Appellant, Mr. Ewing for the Affiliate. Ms. Royce, good morning. Good morning, Your Honor. May it please the Court, I am here today as Counsel for Bobby Lee Elliott, the Criminal Defendant and Appellant in this Court, to argue a case that is, I would submit, reasonably straightforward. We ask only that the Court find that the evidence as to Counts 2 and 3 is legally insufficient. Count 1 is still a good charge. Let me ask you about that. Once your client says, yes, the drugs that I was surrounded by, I intended to distribute, I mean, once he concedes that and he doesn't appeal his conviction on that, why then is not the paraphernalia found, the digital scale and the gun, found together, not with him, I realize, in another room? No one else in the apartment, other indicia of his residence there, that once he admits, yes, these drugs were for distribution, then the paraphernalia that goes with distribution also belongs to him. He has never admitted that the drugs were there for distribution. Well, he hasn't challenged his conviction. He agrees with me that the evidence is technically sufficient to sustain that count because the drugs were so near at hand, but he did not admit in the trial court, and we do not admit here, that he had the drugs for distribution. But it's been found as a matter of law. It was found, yes, Your Honor. Okay. The other little wrinkle with this case is that Mr. Elliott had difficulty getting along with his trial counsel. I've had no problems with him, but he had two trial counsel that he did not get along with, and he made the decision to represent himself. And so this had certain ramifications as to the way the trial was conducted. He had a great deal of difficulty formulating questions, cross-examining the government's witnesses, and, of course, he did not make a Rule 29 motion for judgment of acquittal. Therefore, the case has to be judged against a plain error standard as opposed to one of the more forgiving standards. When the police came to this apartment in southeast Washington, there was a group of police officers, and they entered the apartment all at once, and they found Mr. Elliott in the apartment. It is true, as Your Honor has pointed out, there was no one else in the apartment. But all of the – well, a great deal of the evidence was found in what the police officers referred to as the back bedroom, where Mr. Elliott was seated on a bed. And around him, within arm's reach, was a small plate with crack cocaine on it, a much larger bag on the bed with additional cocaine in it, and three other items. One was his work ID from the Maryland National Capital Parks Association. It was a kind of a laminated card on a chain that you wear around your neck. I think you can see in our appendix we have pictures that the police had taken of the various items of evidence. There was also an envelope right near at hand that said Bobby on it and nothing else. That, of course, is his first name. And there was another envelope prepared as if it was going out in the mail addressed to RBC Ministries and with a return address that says Bobby Lee Elliott, and the address, which is 5319 E Street, Southeast, number 956. I tried to find that. I was just going to say I tried to find that exhibit. Was it a return address label? Was it handwritten? Or do you know? There weren't any photos of it that I saw, but I did go to the police evidence room and personally look at it. It's a handwritten envelope is the way that I remember it. And was the apartment number written on the envelope the same as the apartment that the defendant was found in that was searched? Yes. Yes, that is how I remember it, and I think that is clear from the testimony as well. Now, do you have any authority for the proposition that having the firearm in a different room and not readily accessible makes it insufficient for it to be the basis of account of being used in furtherance of a drug trafficking offense? Well, it depends upon the gestalt of the evidence that is presented. Certainly, if we had proof that Mr. Elliott was the leaseholder, that he had paid the rent, that he had even been seen around the apartment, that he had even been seen with a gun in the neighborhood, you know, that coupled with the fact that it's in another room would probably be sufficient beyond a reasonable doubt. So are you contesting, Ms. Royce, that the evidence supports a jury finding that he was a resident of the apartment? Yes, yes, Your Honor. There is no evidence that he was a resident of the apartment, aside from the fact that he was physically present in the apartment when the officers came in. And the envelope that you just mentioned, which has the return address with the specific apartment number. That's true, Your Honor. And had it been found somewhere else in the apartment, specifically in the room where the gun was, for example, or even elsewhere in the apartment, it would be a much more significant piece of evidence. Well, it might be more significant, but it's surely as significant as it is. It is, Your Honor. And if the question were whether he intended for that envelope to come back to that apartment in the event that it couldn't be delivered, yes, that's proof beyond a reasonable doubt that he intended for the envelope to come back to that apartment. But it's not proof beyond a reasonable doubt that he resided in the apartment or that he had anything except a warm relationship with whoever did. I mean, people use other people's return address from time to time, particularly when they don't have a place where they are sleeping every night. Well, there's no basis on which a jury could find other than that anybody else lived there or that raises really a doubt about it. I mean, is there evidence that raises any doubt that that's where he lived? Well, the burden was on the government to prove that he had dominion and control and knowledge. And there is this sort of minor amount of evidence that shows that that's where he lived. He was found there, and he has an envelope with a return address there. And the belongings, the testimony for the prosecution was that the belongings in the apartment were consistent with him living there. And then the question is, where's the doubt? Where's the doubt? No, Your Honor. With all respect, the things that were found in the apartment were not consistent with his living there. There were many, many things in the apartment, but they found nothing with his name on it anyplace else. They did not show that any of the clothes that were in that second bedroom were his size or fit him. They did not show he had the keys for the apartment or that the keys, whatever he had on him, actually fit the front door for the apartment. They showed virtually no connection between Mr. Elliott and that apartment, aside from these two pieces of evidence. He's physically present in the one bedroom with a gun found in the other. What about the evidence of the vehicle registration and his driver's license? We don't have any evidence of his driver's license. What we do have is evidence that was actually presented by the government showing that this 13-year-old jeep he had parked out in the parking lot was registered to him but at a different apartment number within that apartment complex. In the same building, right? It was 950 instead of 956 or something like that? We do not know whether it was the same building. There is testimony that there were several small apartment buildings together. It makes sense that it would be in the same building. But you can be in the same building as someone else and not be responsible for what they have in their apartment. How did the police get in? Did he answer the door? The evidence does not tell us that, Your Honor. My time is almost up and I had hoped to reserve some for rebuttal. All right. Thank you. We'll give you some. Mr. Ewing? Good morning. May it please the Court, Jane Ewing for the United States. This Court should not disturb the jury's verdict in this case because there was ample evidence that Appellant constructively possessed the gun, really for four main reasons. First, as the Court discussed with Appellant's counsel, there was ample evidence that Appellant lived in this apartment. He was the only person in the residence, which that fact alone distinguishes this case from virtually all of Appellant's cited cases that are insufficient evidence of constructive possession. Second, as the Court discussed with Appellant's counsel, there was mail matter found in the apartment with Appellant's name, the precise address to include apartment 956 as the return address. Now, of course, it's reasonable for the jury to infer that Appellant himself wrote that return address on the envelope. That's where return addresses come from. Is his name above the? Yes, Your Honor, it was. Okay. It said Bobby Lee Elliott, apartment 956, 5319 East Street, Southeast. You know, third, so there's ample evidence that he lived in this apartment. There was no mail matter found in the apartment from anyone else. There was no, this second bedroom didn't even have a bed in it. So there was no, the evidence was devoid of anyone else living in the apartment. But the government's case doesn't even rise or fall on whether he lived there by himself because he was also linked, particularly he was linked to the closet where the gun was found by the presence of that digital scale that was also in the closet. He's sitting in bedroom number one, surrounded by $14,000 worth of crack cocaine, and Officer Appellant told the jury that digital scales are something that cocaine dealers use to weigh out grams, to weigh out the larger amounts of the crack cocaine. So there's a digital scale in the same closet that the gun is in. And we know from this court's decisions in a number of cases, including Johnson, McClendon, Booker, and Wall, that there's this nexus between guns and drugs, that guns and drugs essentially go together. I believe it was McClendon said, you know, drugs or guns are just as much drug paraphernalia as more commonly seen paraphernalia like small ziplocks and things of that nature. That's very broad and very general as a theory. I mean, essentially, if you were operating with others out of the same premises and you happen to be the one found there, you know, independently, but your cousin also is dealing out of, you know, on Hilda's apartment, and you're the one who happens to be arrested there, then just because guns and drugs go together and any drug paraphernalia, it's all attributed to you, it seems like that's a bit of a stretch when the standard is beyond reasonable doubt. Well, Your Honor, I mean, I take your question. I mean, there's certainly a possibility that, for example, someone else could have had access to the apartment. But at this stage, that's not the standard of review. The standard of review is whether the record is devoid of evidence of guilt, and it simply wasn't in this case because, number one, because of the reasons that we talked about that it was apparent that he was living there. But this nexus of the guns and drugs, if you look at where it's important to kind of look at where this gun was positioned, it was essentially just right around the corner into the second bedroom from the bedroom that Mr. Elliott was in, in the closet. And that was located between him and the door. It's loaded with six rounds in the magazine and one in the chamber. So this is a high-quality gun. It costs $900 to $1,000. So it's not the sort of gun that's just kind of left there for years and years and years. But it's hidden, isn't it? Yes, Your Honor. The evidence was that it was underneath some clothes in a clothes hamper on the floor of the closet. In the pictures you can see, it's a pretty shallow closet. It's only about as deep as maybe like a suit of clothes to hang there. So it's just sitting there right on the ground. The pictures that we have were after the officers came in and kind of dumped out the hamper. And the officer said, you know, the gun was essentially on top of the clothes after he dumped it out, meaning it was apparently underneath the clothes earlier. So this is conceivable. I don't think it's beyond a reasonable doubt. If he really lived in the other apartment and he happened to be in a neighbor's apartment, this is stretching things with surrounded by all these drugs, the fact that the gun was hidden, that he didn't have immediate access to it if it was his gun. And since there is a legal admission that he was possessing those drugs with intent to distribute, and once that's a legal admission, then whatever is attached to distribution, like the scale, like the gun, comes in. I mean, it supports his conviction on the two counts that he is appealing. How hard would it have been for you to, because a lot of these cases, it's very easy to say, yes, he was a size whatever, 42, and these clothes were size 42 or large, he's large. You mean the clothes in the second bedroom? Right. I don't know. I mean, I don't have the answer to that, Your Honor. I do know that, I mean, the testimony was that they appeared to be male clothing. Right. But as far as, you know, sizes and things of that nature, I don't know why we didn't elicit that information. I don't have any information on that. You wouldn't even have to, I mean, the defendants there in the courtroom, you could say the clothes were large, the jury could see he was large. I don't know why we did that, Your Honor. I guess my only point on that would be, even assuming for the sake of argument, it appeared that he did live there, but even assuming for the sake of argument that he didn't live there, if you were receiving mail, if you put your return address on an envelope and you're receiving mail at a location, that's indicia that you exercise dominion and control over that premises. No, not necessarily. I mean, I really think that if you think about how many drug dealers live, it's a pretty itinerant existence, and they're not going to be on a lease, potentially. They're going to be, you know, couch surfing here and there, and maybe this is, you know, a stable and trusted relative or a friend or, you know, or just something that isn't necessarily the place where he lives. I'm actually really surprised that the prosecution didn't put in evidence of residence other than what happened to be on the bed. It seems like there's hundreds of ways to prove where someone lives. Like a lease. Well, it wasn't just that he happened to be on the bed, Your Honor. There was also the mail matter with the return address. That's what I said, and what happened to be on the bed with him. Okay, I understand. Yeah, I mean, just, you know, there are neighbors, there are, you know, any number of, if there's any employment records, if there's Social Security, if there's a lease, if there's, I mean, there are just any number of ways of establishing where someone lives, and it just, it seems like with these kinds of serious charges that you would have had a little bit more investigation of a basic fact like that. I guess, Your Honor, in response to that, I would just go back to the standard of review at this point, and we're looking at whether the record was devoid of evidence of guilt. We have the evidence, such as it is, of his residence, coupled with the evidence, evidence of, you know, guns and drugs going together. I would just, I would point this court to the Booker case. I mean, in Booker, the gun was found on the street, so it wasn't even a situation where the Booker had the ability to exclude other people from the street. But because the gun was linked to this Newport cigarette packet that had drugs in it in that case, this court noted that, you know, that the guns and drugs go together, and that that can be kind of one of the plus factors that this court talked about in Alexander. But what were the circumstances of the Newport packet and the gun as far as their proximity to each other? You mean on the street? Yes. They were right next to each other, that's right. So these were things, the scale was in the closet, but it was like on a shelf or something? Correct, Your Honor. The scale was in a bag on the top shelf of a closet. There was only one shelf in the closet. It was essentially one shelf over a hanging rod, and the scale was in a bag there, and the gun was underneath. At the bottom of a clothes hanger. That's correct, Your Honor. But it was a very short distance away from, I mean, it was in the other bedroom, but it was a very short distance away from where Appellant was, surrounded by all these drugs. It was between him and the door. It was loaded. You know, there was ample. Do we know how the police got in? Did he answer the door? Did they have a search warrant? What happened? Your Honor, the record is silent on that. I actually kind of tried to look into it a little bit more just outside the record and before this morning and wasn't able to figure it out, so I'm not, I don't have any additional info. We know there was a warrant, we just don't know how they entered. That's correct.  Because he's found in the back bedroom, which if you look at the layout of the apartment, it's kind of all the way down the hall. Okay. When the officer, whoever testified, began his testimony, he didn't say, we had a warrant. The testimony went along the lines of, we were executing a search warrant at this address and it kind of continued from there. And then the next thing was we found him in the bedroom. Yes. Not how we got in. Correct, Your Honor. That's right. I see I'm out of time. If there are no further questions, I would simply. I'm trying to understand the government's position. Is it your position that because if somebody appears to have dominion and control of an apartment because they're found there and there's some evidence that they may live there, that they necessarily have dominion and control over everything in the apartment? Well, Morris and Long, both in the Morris case and the Long case, this court said, if someone is living in an apartment, then they can be presumed to have dominion and control over the contents of that apartment. Now, I would concede that I think the evidence in Morris and Long that the folks were actually living there was stronger than what we have here, but that's not all we have in this case. We also have the nexus between the guns and the drugs, the independent nexus between the appellant and the closet where the gun was found because of that digital scale. So we're not relying solely on the evidence that he lived there, although that's powerful evidence. We have this additional link between him and the scale. Although that is assuming that there aren't other drug dealers working in and around that very same apartment, right? Because, I mean, a digital scale is linked and with the cocaine residue appears to be linked to drug trafficking, but to his drug trafficking? Again, that's another thing that depends on his residence in the apartment, no? It's wrapped up. It's not necessarily clearly visible. It's stowed away. Could be, you know, Cousin Joe's scale. And the gun is kind of odd. I mean, you would take a loaded gun and shove it under clothes in a hamper, and then when some stick-up boys come in, you're going to reach your hand down in there and shoot your fingers off. I mean, it's a strange place for someone to have it poised to use it in furtherance of the activity that he's involved in. Your Honor, if you look at it, I believe it's either Government's Exhibit 104 or 105 that was presented with the appellant's brief. It's not really a strange place for the gun to be because it's— but we know, I mean, it's been established by— I understand the layout, but, I mean, even if it was on the shelf next to the— then you come by when someone's coming to the door and grab it, but it's not a handy place to grab it out of the bottom of a— Well, the clothes hamper we're talking about was not very tall. I mean, it was a short—it wasn't a big, tall clothes hamper. It was a short clothes hamper, so it wouldn't have been all that difficult to reach in and grab the gun. I'm just saying that it seems much more likely that somebody is stashing it there to hide it, to ditch it, than to have it at hand for protection in the ongoing— That's why it's so important. I mean, if the police knocked and you said police, he puts that gun in the hamper. If the police throw the door open, come in, and that gun is hidden away from the drugs, away from being able to protect him, I realize he doesn't have to be able to use it just so he can possess it. Right. That makes—it makes a difference to me how the police got in. The record is silent on that point, Your Honor. I guess we would just say that particularly under the standard of review that we're here today, which is whether the record is devoid of the evidence, we think it's certainly not devoid of the evidence that he constructively possessed that gun, so we would ask that the judgment of the district court be affirmed. Mr. Ewing, on the standard of review, you had placed some emphasis. It seemed like there was a difference articulated between the defendant's view of standard of review and yours, and I don't really see that in our case law. It seems like the manifest miscarriage of justice is an iteration of a plain error standard when we're talking about sufficiency of the evidence, and it's part of— I mean, can you explain to us whether there really is anything different there in your view under our cases? Well, I think that the—even under the preserved motion for judgment of acquittal, it's a very— Deferential to the verbiage. You're looking at the evidence in the light most favorable to the government, whether any juror, whether any rational jury could have found guilty. So then if there's not a motion for judgment of acquittal, the case law seems— I believe it's the Williams case from just earlier this year, talks about the record being devoid of evidence of guilt. I'm just asking you because you had briefed as if plain error and manifest miscarriage of justice are really different, and I just don't see them— I think they're similar, Your Honor. I guess I was using this court's terminology when I talked about devoid of evidence. Yeah, no, I'm not really taking issue with your saying it's more deferential to the jury, but we have to write an opinion, presumably, and one of the points that the government had made was, I know this is a different standard from what the defendant's arguing, and I just wondered if you cast any light on that. But it sounds like you are comfortable with a differential standard, a plain error review, and it's deferential. I don't think the standard review is necessarily dispositive in this case. We would say that the Williams language is appropriate, the manifest miscarriage of justice, and the devoid of the evidence, and we would suggest that that's the standard of review that this court used. Thank you. All right. Thank you. Thank you, Your Honor. Let's see. Ms. Royce does—or she does have some time. Okay. With all respect to Mr. Ewing, I need to correct a couple of things that he said here. He referred to the Booker case, but a closer inspection of the Booker case shows that there was a police officer observing Booker on the street, and he saw him go to a location at least one time and come back with drugs and distribute them. And when the police came to arrest him and they had a few words with him, he said, oh, I need my Newport cigarettes, or words to that effect. And then when they got over to where the Newport cigarettes were, there was the gun immediately adjacent to the drugs in the cigarette pack. So that's quite different from the situation that we have here. You know, the government needed to show on some level that Mr. Elliott had knowledge that the gun was there and that he had dominion and control over it. Some words, some actions, some gesture, I think the case law says, has to connect a defendant with a gun or there is not sufficient evidence. And I see my time is up. Can I ask one question, though? Is it your position that if they prove constructive possession, then they also prove the 924C count, or that there has to be something in addition to just possession that has to be established for there to be sufficient evidence of that count? I think for a 924C count, which is the count that required the consecutive 60-month sentence, there must also be some indication that the person possessed the drug in furtherance of a drug-trafficking crime. That's the additional element there. You said possessed the drug in furtherance of drug-trafficking, but I assume you mean possessed the gun in furtherance of drug-trafficking. Excuse me. Possessed the weapon in furtherance of the drug-trafficking crime. If there are no further questions, we'll submit that the court should reverse and remand for a judgment of acquittal on counts 2 and 3. All right. Ms. Royce, you are appointed by the court to represent your client, and we thank you for your very able assistance. Thank you.
judges: Henderson, Pillard, Wilkins